1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| BRENDA LERMA, INDIVIDUALLY, )( | |
| AS NEXT FRIEND OF J.L. AND )( | |
| D.L., AND AS REPRESENTATIVE )( | |
| OF THE ESTATE OF LUIS LERMA; )( | |
| FOR AND ON BEHALF OF ALL )( | |
| THOSE ENTITLED TO RECOVER )( | |
| FOR HIS DEATH UNDER THE )( | |
| TEXAS WRONGFUL DEATH AND )( | CIVIL ACTION |
| SURVIVAL ACTS; LUIS ORALDO )( | |
| LERMA MIRELES and NINFA )( | NO. 1:12-229 |
| CANTU GARCIA DE LERMA )( | |
| Plaintiffs )( | |
| VS. )( | |
| )( | |
| BRIGGS & STRATTON )( | |
| CORPORATION and BRIGGS & )( | |
| STRATTON POWER PRODUCTS, LLC )( | |
| Defendants )( | |

ORAL AND VIDEOTAPED DEPOSITION OF
ISRAEL RAMOS
JUNE 20, 2013

ORAL AND VIDEOTAPED DEPOSITION OF ISRAEL RAMOS,

produced as a witness at the instance of the

PLAINTIFFS, taken in the above styled and numbered

cause on JUNE 20, 2013, reported by SHELLEY STINGLEY,

Certified Court Reporter No. 5725, in and for the State

of Texas, at the Hampton Inn and Suites Board Room,

1202 Ed Carey Drive, Harlingen, Texas, pursuant to the

Federal Rules of Civil Procedure.

EXHIBIT B                          COPY

BRYANT & STINGLEY, INC.
Harlingen (956) 428-0755        McAllen (956) 618-2366

14

11:11  1          A.   No.

11:11  2          Q.   But what I'm trying to use this exhibit for is

11:12  3    to establish that the site is out -- is surrounded by

11:12  4    water.   Is that correct?

11:12  5                    MR. TERRY:   Objection; form.

11:12  6          A.   Yes.

11:12  7          Q.   That is correct?

11:12  8                    MR. TERRY:   Objection; form.

11:12  9          A.   Correct.

11:12  10         Q.   What was being built at the site in Exhibit

11:12  11   No. 2?

11:12  12         A.   Well, we call it a floor, but it's a deck.

11:12  13         Q.   Was that the specific job that you were doing?

11:12  14         A.   Yes.

11:12  15         Q.   What was the overall structure going to be

11:12  16   that's shown in Exhibit No. 2?

11:12  17         A.   A house.

11:13  18         Q.   A house on the water?

11:13  19         A.   Yes.

11:13  20         Q.   What time did you arrive to the site?

11:13  21         A.   Around 9:00.

11:13  22         Q.   9:00 in the morning on May 21, 2011?

11:13  23         A.   Yes, 9:00, 9:30, around that time.

11:13  24         Q.   And when y'all arrived, what did y'all first

11:13  25   do?

Electronically signed by Shelley Stingley (601-001-949-3626)                    873014bc-d80e-46c7-a8aa-0b2e2aa3d686

11:13 1    A.   We started to pull out some extensions and put

11:14 2  them there on top of the deck.

11:14 3    Q.   And when you say extensions, what do you mean?

11:14 4    A.   The electrical cords where we plug in the

11:14 5  drills.

11:14 6    Q.   Where did y'all place the generator on May 21,

11:14 7  2011?

11:14 8    A.   On top of the boat.

11:14 9    Q.   And what did y'all plug into the generator?

11:14 10   A.   The extension cord.

11:14 11   Q.   Where did the extension cord -- or strike that.

11:14 12        Where was the boat in relation to the dock

11:14 13  that's depicted in Exhibit No. 2?

11:14 14   A.   In this area.  No, I'm sorry, here, behind.

11:14 15   Q.   Could you turn it around and then point on the

11:15 16  camera?  And I'm going to get the guy with the video to

11:15 17  zoom in.

11:15 18   A.   (The witness complied)

11:15 19   Q.   Did y'all tie the boat up to the dock or to the

11:15 20  deck?

11:15 21   A.   Yes, the boat was tied up here on the pole.  It

11:15 22  was tied up.  The boat was not moving at all.

11:15 23   Q.   Where was the extension cord that was coming

11:15 24  out of the generator?

11:15 25   A.   Well, the boat is here; the extension cord was

16

11:15 1    here on top of the boards.

11:15 2         Q.   So the extension cord was out of the water?

11:15 3              MR. TERRY:   Objection; form.

11:16 4         A.   Yes.

11:16 5         Q.   Now, what were you doing when -- or strike

11:16 6    that.

11:16 7              Did y'all have separate tasks that y'all

11:16 8    were doing, the three of y'all, on May 21, 2011, out at

11:16 9    the site?

11:16 10        A.   Yes.

11:16 11        Q.   What was your task?

11:16 12        A.   To put the boards up here and to set them in

11:16 13   the place where you step on, which is really the

11:16 14   ground, the floor.

11:16 15        Q.   So you were setting the floor of the deck?

11:16 16             MR. TERRY:   Objection; form.

11:16 17             MR. WHITE:   What's the basis?

11:16 18        A.   Yes.

11:16 19             MR. TERRY:   You're telling him what he's

11:16 20   testifying to, "So you're setting the floor on the

11:16 21   deck."

11:16 22             MR. WHITE:   After he tells me that he put

11:16 23   it there and I'm confirming what he's saying.

11:17 24             MR. TERRY:   Yeah, you're repeating what he

11:17 25   said.  That's not a question.  And if it is a question,

Electronically signed by Shelley Stingley (601-001-949-3626)          873014bc-d80e-46c7-a8aa-0b2e2aa3d686

17

| | | |
|---|---|---|
| 11:17 | 1 | it's a leading question. |
| 11:17 | 2 | MR. WHITE: Okay. And your objection was |
| 11:17 | 3 | form? |
| 11:17 | 4 | MR. TERRY: Yes. |
| 11:17 | 5 | MR. WHITE: Gotcha. |
| 11:17 | 6 | MR. TERRY: I'll make more if you want. |
| 11:17 | 7 | MR. WHITE: Well, you're doing good with |
| 11:17 | 8 | them already. |
| 11:17 | 9 | MR. TERRY: Yeah, I thought I was limiting |
| 11:17 | 10 | them. |
| 11:17 | 11 | Q. What was Juan doing on May 21, 2011 prior to |
| 11:17 | 12 | the accident? |
| 11:17 | 13 | A. He was in this area here. He was with the |
| 11:17 | 14 | drill drilling the boards that we were putting on the |
| 11:17 | 15 | floor. |
| 11:17 | 16 | Q. Was he on top of the deck? |
| 11:17 | 17 | A. Yes, on top standing up. |
| 11:17 | 18 | Q. Were you and Juan working together, or no? |
| 11:17 | 19 | A. Yes. |
| 11:17 | 20 | Q. You and Juan were working together putting the |
| 11:17 | 21 | decks -- putting the boards on top of the deck; is that |
| 11:17 | 22 | correct? |
| 11:17 | 23 | MR. TERRY: Objection; form. |
| 11:18 | 24 | A. Yes. |
| 11:18 | 25 | Q. What was Luis doing prior to the accident? |

BRYANT & STINGLEY, INC.
Harlingen (956) 428-0755          McAllen (956) 618-2366

Electronically signed by Shelley Stingley (601-001-949-3626)          873014bc-d80e-46c7-a8aa-0b2e2aa3d686

18

| | | |
|---|---|---|
| 11:18 | 1 | A.   He was putting -- he was making a hole in these |
| 11:18 | 2 | poles.  He would put -- he would make a hole and then |
| 11:18 | 3 | would put a screw that would go to the other side of |
| 11:18 | 4 | the pole.  He would put a long screw. |
| 11:18 | 5 | THE INTERPRETER:  What's "wasa"? |
| 11:18 | 6 | MR. TERRY:  Washer. |
| 11:18 | 7 | THE INTERPRETER:  With "wasa"? |
| 11:18 | 8 | MR. TERRY:  Washer. |
| 11:18 | 9 | INTERPRETER:  Washer? |
| 11:18 | 10 | MR. TERRY:  That's English.  That's the |
| 11:18 | 11 | English word. |
| 11:18 | 12 | A.   With washer and then the knobs. |
| 11:18 | 13 | Q.   How long were the screws? |
| 11:18 | 14 | A.   It depends on the pole.  There are some thick |
| 11:18 | 15 | ones and there are thinner ones.  There are some that |
| 11:18 | 16 | are 16 inches or 18 inches wide. |
| 11:19 | 17 | Q.   How long were the poles that were out there on |
| 11:19 | 18 | the deck? |
| 11:19 | 19 | A.   The ones that were down underground? |
| 11:19 | 20 | Q.   Yes. |
| 11:19 | 21 | A.   16. |
| 11:19 | 22 | Q.   Feet? |
| 11:19 | 23 | A.   16 feet. |
| 11:19 | 24 | Q.   Now, how wide were they? |
| 11:19 | 25 | A.   I mean thick. |

BRYANT & STINGLEY, INC.
Harlingen (956) 428-0755          McAllen (956) 618-2366

Electronically signed by Shelley Stingley (601-001-949-3626)          873014bc-d80e-46c7-a8aa-0b2e2aa3d686

19

11:19  1     Q.   How thick were they?

11:19  2     A.   Between 12 to 14.

11:19  3     Q.   Inches?

11:19  4     A.   Inches, yes.

11:19  5     Q.   What type of drill was Luis using?

11:19  6     A.   It's a drill this big.  It has a handle here,

11:19  7     has a handle here, a handle here, and then the drill to

11:19  8     make the holes.

11:19  9     Q.   Now, when Luis was drilling holes in the poles,

11:20  10    where was he?

11:20  11    A.   He was on the third line from here -- one, two,

11:20  12    three -- four poles, on the third line going inside and

11:20  13    then four feet going to the front.

11:20  14    Q.   And I need to ask you a more general question

11:20  15    and -- you know, I'm trying here.  In general, where

11:20  16    was Luis?  Was he on the deck with you and Juan or was

11:20  17    he in the water when he was screwing the holes in the

11:20  18    poles?

11:21  19    A.   He was standing on the water.

11:21  20    Q.   Now, how deep --

11:21  21    A.   Like -- it was shallow.

11:21  22    Q.   How deep was the water?

11:21  23    A.   About 20 inches.

11:21  24    Q.   Would that be below the knee?

11:21  25    A.   More or less, yes, at the knees, knee.

BRYANT & STINGLEY, INC.
Harlingen (956) 428-0755          McAllen (956) 618-2366

Electronically signed by Shelley Stingley (601-001-949-3626)          873014bc-d80e-46c7-a8aa-0b2e2aa3d686

20

11:21  1          Q.  Do you remember what the weather was like on

11:21  2    May 21, 2011?

11:21  3          A.  It was okay, no wind.  It was okay.

11:21  4          Q.  Was it raining?

11:21  5          A.  No.

11:21  6          Q.  Was it hot?

11:21  7          A.  Yes.

11:21  8          Q.  Was it muggy or humid?

11:22  9          A.  No.

11:22  10         Q.  Now, before we get into the actual when the

11:22  11   accident happened and the specifics of that, I just

11:22  12   want to ask you about how many of the -- or first off,

11:22  13   how many holes was Luis drilling in each pole?

11:22  14         A.  One.

11:22  15         Q.  And how many poles had he drilled before the

11:22  16   accident, more or less?

11:22  17         A.  13.

11:22  18         Q.  And how many total was Luis going to drill

11:22  19   holes in on that day?

11:22  20         A.  24.

11:23  21         Q.  Now, as Luis is about to -- or as -- how long

11:23  22   did it take for the 13 holes to be drilled?

11:23  23         A.  It took him about three hours for these 10.  In

11:23  24   the morning when he arrived, in the morning when we

11:23  25   arrived, he drilled one, two, three -- three.

Electronically signed by Shelley Stingley (601-001-949-3626)                873014bc-d80e-46c7-a8aa-0b2e2aa3d686

51



12:42  1      Q.   What bit size would you be using?

12:43  2      A.   I don't know.  I haven't checked it.

12:43  3      Q.   Is it like half-inch?

12:43  4      A.   You mean the edge?

12:43  5      Q.   Yes.  Were you using a half-inch bit to drill

12:43  6   holes through the wood?

12:43  7      A.   Three-eighths.

12:43  8      Q.   Three-eighths, okay.  Now, was there an

12:43  9   extension cord for each tool?

12:43  10      A.   Not for ours.  There's only one extension that

12:43  11   has three -- that had three -- that has three plugs.

12:44  12   It has a big head.  An extension has the big head.  It

12:44  13   just has a cable cord and that connects -- plugs into

12:44  14   the generator.  That's what -- for what we were using.

12:44  15      Q.   Okay.  So you had one extension cord to the

12:44  16   generator and the two tools would be connected to the

12:44  17   end of that extension cord?

12:44  18      A.   Mine, yes.

12:44  19      Q.   And Mr. Lerma would have attached his to the

12:44  20   same extension cord?

12:44  21      A.   Not to mine.  It was connected directly to the

12:44  22   machine.

12:44  23      Q.   Was Mr. Lerma's drill plugged into the

12:44  24   generator?

12:44  25      A.   To the generator.

Electronically signed by Shelley Stingley (601-001-949-3626)          873014bc-d80e-46c7-a8aa-0b2e2aa3d686